UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                         :
SHEILA BROWN,                                            :
                                                         :
                                                         :       11 Civ. 2915 (PAE)
                                  Plaintiff,             :
                                                         :       OPINION & ORDER
                                                         :
                    -v-                                  :
                                                         :
CITY OF NEW YORK and NEW YORK CITY HUMAN   :
RESOURCES ADMINISTRATION DEPARTMENT OF      :
SOCIAL SERVICES,                                         :
                                                         :
                                  Defendants.            :
                                                         :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Plaintiff Sheila Brown, an employee of the City of New York ("City") in the City's

Human Resources Administration, Department of Social Services ("HRA"), brings several

claims of employment discrimination against the City and HRA pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), New York State Human Rights

Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and New York City Human Rights Law,

N.Y. City Admin. Code §§ 8-101 *et seq.* ("NYCHRL"). Brown alleges that she was subjected to

a hostile work environment and retaliated against for opposing the City's unlawful employment

practices. Defendants deny each of Brown's claims and now move for summary judgment under

Federal Rule of Civil Procedure 56(a). For the reasons that follow, the Court grants the City and

HRA's motion for summary judgment as to Brown's retaliation claim, but denies that motion as

to Brown's hostile work environment claim.

I.    **Background and Undisputed Facts**[1]

    A.    **Key Persons, Entities, and Terms**

In March 1990, Brown began her employment as a provisional Caseworker in the City's

HRA. Brown Dep. 20–21; Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1. In October 1992, Brown was appointed a

Caseworker. Brown Dep. 30; Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2. In March 1999, Brown was promoted

to the level of Supervisor I (Welfare) in HRA's Office of Employment Services. Brown Dep.

37; Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3. In May 2001, Brown applied for, and was selected for, her

current position, as a Supervisor I in HRA's Adult Protective Services ("APS"), Family Type

Homes for Adults Unit. Brown Dep. 41–43; Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4. Brown's new position in

APS was a lateral transfer, not a promotion. Brown Dep. 43; Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.

Brown's day-to-day responsibilities include: "going out in the field . . . on pending cases to open

up homes for people applying to be a provider to care for the clients," as well as "answering the

phones [and] screening providers." Brown Dep. 43; Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7. Between 2001

and 2004, Brown did not have any supervisory responsibilities. Brown Dep. 51; Def. 56.1 ¶ 9;

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions
in support of and in opposition to the instant motion, including: Defendant's Local Rule 56.1
Statement ("Def. 56.1") (Dkt. 37); the Declaration of Cindy E. Switzer in Support of Defendant's
Motion for Summary Judgment ("Switzer Decl.") (Dkt. 38) and attached exhibits; Plaintiff's
Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 45); the Declaration of Ismail S. Sekendiz in
Opposition to Defendant's Motion for Summary Judgment ("Sekendiz Decl.") (Dkt. 44) and
attached exhibits; and the deposition of Sheila Brown ("Brown Dep.") (Sekendiz Decl. Ex. A).
References herein to a paragraph in a party's 56.1 statement incorporate by reference the
evidentiary materials cited therein. Where facts stated in a party's Statement of Material Facts
are supported by testimonial or documentary evidence, and denied by a conclusory statement by
the other party without citation to conflicting testimonial or documentary evidence, the Court
finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the
statement of material facts set forth in the statement required to be served by the moving party
will be deemed to be admitted for purposes of the motion unless specifically controverted by a
correspondingly numbered paragraph in the statement required to be served by the opposing
party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any
statement of material fact[] must be followed by citation to evidence which would be admissible,
set forth as required by Fed. R. Civ. P. 56(c).").

Pl. 56.1 ¶ 9. In 2004, Brown was assigned to supervise one Caseworker, Michelle McGeacy. Brown Dep. 65; Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10. In 2005 or 2006, Brown was assigned a second caseworker to supervise, Nse Etuk. Brown Dep. 65; Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17. In May 2001, when Brown transferred to APS, Anna Marquez was Brown's direct supervisor. Brown Dep. 43; Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6. In July 2002, Marquez left and Jerry Victor became Brown's APS supervisor.[2] Brown Dep. 52; Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.

In May 2007, Victor assigned Brown to supervise a third caseworker, George Miller ("Miller"). Brown Dep. 68–69; Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21. Miller is central to this case, as Brown's allegations of sexual harassment stem primarily from Miller's behavior at HRA. Miller had previously worked for the City, and from approximately the end of 2004 until 2006, Miller worked in the same building as Brown and Victor. Brown Dep. 68; Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23. In 2006, Miller was terminated from his employment with the City; Brown did not know why Miller had been fired, but had heard rumors that he was "bothering a female." Brown Dep. 69; Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24. In 2007, the City reinstated Miller and assigned him to work under Brown's supervision. Brown Dep. 68; Def. 56.1 ¶ 22; Pl. Dep. ¶ 22. Neither Brown nor Victor knew why Miller had been cleared to return to work. Brown Dep. 69–70; Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25. Brown was responsible for approving Miller's weekly time and leave. Brown Dep. 110–11.

---

[2] Unless otherwise specified, the Court uses the term "supervisor" in the colloquial sense that the parties use it to describe Victor's relationship to Brown and Brown's relationship to George Miller, not in the legal sense. *See generally Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013).

**B.     Fact's Relevant to Brown's Hostile Work Environment Claim**

       **1.     Miller's Conduct Directed At Brown**

During the roughly three years that Brown was Miller's supervisor, several incidents

occurred which Brown alleges constitute a hostile work environment. These incidents, the facts

of which are undisputed, are as follows.

In May 2007, about a week or two after Miller started working under Brown's

supervision, he informed Brown that "he's not taking orders from females." Brown Dep. 111;

Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30. Brown told Victor about the problem and Victor responded, "[j]ust

do [Miller's] time and leave." Brown Dep. 111. Subsequently, Brown's only responsibility, in

regard to Miller, was approving his weekly time and leave. *Id.* This consisted of "[l]ooking at

the [computer] screen" at the end of each week to see "that the person swipes in and out [with

their ID card], . . . and saying okay." *Id.* at 113.

While under Brown's supervision, Miller informed Brown that he had multiple

personalities for his mood swings, which he referred to as the "seven Georges." Brown Dep.

116–17, 119; Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40. Miller told Brown that "Friday was always a Friday

party George," but that there was also "killer George, girl George, boy George." *Id.* Brown

believes that there was also a "lover George." *Id.* Brown does not remember the other two

Georges. *Id.*

Miller frequently stared at female co-workers in Brown's presence, specifically "Jennifer

and Elizabeth" who worked near Brown's desk. Brown Dep. 115. Miller also exhibited a

general "aggressiveness towards females," in that, on certain occasions, "he would make a face

as if like if you say one more thing—you know, that's the physical aggressiveness, besides

4

touching." Brown Dep. 120–21; Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35.  Brown described Miller's face on

such occasions as "threatening."  Brown Dep. 121.

Miller also touched or held Brown's hands whenever he "hand[ed her his] case record."

*Id.* at 113, 115.  Each time Miller came over to Brown's desk to "touch [her] hand or rub [her]

hand," Brown told Miller that his behavior was inappropriate and was making her feel

uncomfortable, and she asked him to stop.  Brown Dep. 119; Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57.

Miller "stop[ped] immediately" each time.  *Id.*  On several occasions, Brown observed Miller

with a blanket over him and "his hand on his crotch," after which Miller would "use the restroom

by the kitchen [to] wash up."  Brown Dep. 114; Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.

### 2.   Victor's Conduct and Knowledge of Miller's Conduct

In July 2002, Victor became Brown's direct supervisor in APS.  Brown Dep. 52; Def.

56.1 ¶ 8; Pl. 56.1 ¶ 8.  In May 2007, Victor assigned Miller to work under Brown's supervision.

Brown Dep. 68; Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.  Brown testified that she told Victor about Miller's

behavior "[a]ll the time."  Brown Dep. 120; Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.  Brown testified:

"Every time [Miller] did something on the floor sexual or the loud noises was [*sic*] just

unbearable, I would go to Jerry and tell Jerry and Jerry would just ignore me."  Brown Dep. 120.

Brown testified that, one time when she tried to complain, "Jerry turned his office chair from me,

just turned it around as if I was talking to the wall."  *Id.*  Brown testified that she told Victor

"something has to be done" because Miller's "aggressiveness with females is just unbearable."

*Id.*

In addition, Brown testified that "a couple years before" Brown started supervising

Miller, Victor told Brown that "a man and God are equal and a woman is below."  Brown Dep.

98–99.

### 3.   Miller's Conduct Directed at Brown's Co-workers

Aside Miller's behavior specifically towards Brown, Brown was also aware that Miller

had a history of directing inappropriate conduct towards other female employees.  For example,

Brown testified that she heard rumors that Miller had been fired from his previous job with the

City in 2006 because "he was bothering a female" at his old workplace.  Brown Dep. 69; Def.

56.1 ¶ 24; Pl. 56.1 ¶ 24.  Moreover, while supervising Miller at HRA, Brown received numerous

complaints from her female co-workers about Miller's behavior in the workplace.  *See* Brown

Dep. 115; 174–75; 187–88.

When Miller was under Brown's supervision, three or four female employees informed

Brown that "Miller would greet them with a bear hug and not let them go."  Brown Dep. 174–75;

Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39.  Three female co-workers, on different occasions, all complained to

Brown that they could "hear Miller in the bathroom, [making noises that] sounded like he was

masturbating" and "moaning and groaning."  Brown Dep. 115, 187–88; Def. 56.1 ¶ 38; Pl. 56.1

¶ 38.  Around March 2010, female employees from a different floor told Brown that Miller

would "come downstairs and ask them for sex," telling them that he "hasn't had sex in a long

time."  Brown Dep. 132; Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50.

On March 5, 2010—the last date Brown was in the office with Miller, *see* Def. 56.1

¶ 105; Pl. 56.1 ¶ 105—Miller "sexually exposed himself and grabbed some of the female

workers on [Brown's] floor."  Switzer Decl. Ex. W (Brown's email to HRA personnel describing

Miller's behavior while at work on March 5, 2010).  At "various times during the day," three

female workers told Brown that Miller "greeted them with a 'Bear Hug' and wouldn't let go of

the hugging," and that they "had to pull themselves away from Mr. Miller."  *Id.*

After Brown left work that afternoon, at around 5:45 p.m., Miller started bothering Cherry-Ann Samuel, a City employee. Sekendiz Decl. Ex. CC (Samuel's memo to APS personnel describing her encounter with Miller on March 5, 2010). When Samuel went into the floor bathroom to remove her make-up bag, Miller "tried grabbing [her] hands," and told her to "come here, come here." *Id.* Samuel reported that she felt "very frightened" and "unsafe returning to [her] place of employment." *Id.*

About 15 minutes after this incident, Miller "inappropriately, grabbed, touched and sexually harassed" Valdine Depeiza. Sekendiz Decl. Ex. Z (Depeiza memo to APS Personnel describing her encounter with Miller on March 5, 2010). Depeiza complained that at 6 p.m. on March 5, 2010, Miller "suddenly grabbed [her] tightly around [her] waist and would not release [her]." *Id.* When Depeiza tried to push Miller away, he "grabbed [her] chest." *Id.* Ten minutes after this encounter, Miller walked to Depeiza's cubicle, "hit [her] on [her] shoulder," and when Depeiza turned to look at him, Miller "was standing inside of [her] cubicle, fully exposed from waist down masturbating." *Id.* Numerous other co-workers and supervisors, both male and female, observed this incident, although Brown did not. *Id.* A supervisor named Barbara Mitchell saw Miller masturbating and stated "if I didn't see this with my own two eyes I would not have believe[d] it." *Id.* Another supervisor, Mr. Barnett, was called, and he came and escorted Miller out of the building. *Id.*

### 4. Miller's Conduct in the Workplace Generally

Miller also exhibited abnormal behavior in the workplace unrelated to sex or gender. While at work, Miller would "have his big headphones on his ear," would "sing lyrics, [use] profane language," and make noises that sounded like gunshots. Brown Dep. 113–14; Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36. Sometimes, Miller "would just start yelling and screaming" while at his

7

desk. Brown Dep. 114. On one occasion, Miller came into the office with a "black eye" and "his hand was swollen like he punched somebody." Brown Dep. 117–18; Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43. On that day, Brown testified that Miller had "a look like if we come near him, he will explode." Brown Dep. 118; Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44. On another occasion, Miller "went into the kitchen" and started "punching the cabinets," saying that he "didn't get his pay or wasn't getting paid." Brown Dep. 124. "[A]t times," Brown recalled seeing Miller "stand[ing] in the middle of the office floor, pointing his finger like a gun" and make shooting gestures. *Id.* at 133.

Miller also told Brown, Sandra Ferguson, and Beverly Boyd (other City employees) about "his actions outside on the streets," which mostly consisted of stories of Miller's arrests. *Id.* at 117. However, neither Brown nor her co-workers ever learned why Miller had been arrested. *Id.* at 117, 185–86; Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.

### C.   Facts Relevant to Brown's Retaliation Claim

Brown's retaliation claim centers around Victor's conduct after Brown wrote a memorandum on December 29, 2009 (the "Memo") describing Miller's workplace behavior. *See* Sekendiz Decl. Ex. F (Brown's Dec. 31, 2009 Memo about Miller). Brown's Memo, addressed to Deborah Holt-Knight, Director of APS Client Services, addresses Miller's "abnormal behavior." Sekendiz Decl. Ex. F. In particular, in the Memo, Brown described the "seven Georges" and detailed how Miller "wears music headphones . . . talk/rap[s] 'loud lyrics' such as 'gun shots' and 'profane language,'" and "dances in the aisle while workers are in their cubicle working." *Id.* In the Memo, Brown reported that Miller "becomes agitated with supervision and especially a female," and displays "aggressive behavior with females." *Id.* Brown's Memo also informed Holt-Knight that she "can only receive [Miller's] cases with out [*sic*] reviewing them with him" because Miller "demonstrated that his assign cases [*sic*] on what he worked on are

8

approved by the unit Director who is a male." *Id.* Brown's Memo did not mention Miller staring at, touching, or hugging Brown, or any other City female employee. Nor did it mention anything about Miller masturbating at work, either at his desk or in the bathroom.

In January 2010, Lula Strickland, a Provider-Intake Coordinator, retired from HRA. *See* Sekendiz Decl. Ex. J (Victor's March 17, 2010 memorandum to Brown, Bernadette Jackson, and Camille Tomlinson-Kerr stating that Strickland's duties and responsibilities would have to be covered by others until a replacement was hired and fully trained). In mid-January 2010, Victor assigned Brown and Bernadette Jackson, another Caseworker, to cover Strickland's duties. *See* Sekendiz Decl. Ex. J (Victor's March 17, 2010 memorandum detailing the assignment). On March 22, 2010, Brown wrote a memo to Victor protesting the assignment. *See* Sekendiz Decl. Ex. I, at D1263. In a responsive memo, dated March 22, 2010, which copies Jackson and Tomlinson-Kerr, Victor asserted that Brown had not carried out the duties as requested and was disobeying direct orders from her supervisor. *See* Sekendiz Decl. Ex. I, at D1257 .

Years before, in 2005 or 2006, Victor had assigned Brown to perform similar clerical work. Brown Dep. 64–65; Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18. These duties included: "answer[ing] the phone, do[ing] the fax, clerical work, [and] field work at times." *Id.* Additionally, in 2006 or 2007, Brown had been assigned an "additional task" of "count[ing] the heads in the unit." Brown Dep. 66; Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19. Every day, Brown would conduct a head count of "each person in each floor or unit." *Id.* At around the same time, in late 2006 or early 2007, Brown verbally complained to Victor that she was being given "clerical staff duties." Brown Dep. 66; Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20. Victor responded by giving away Brown's pending cases and assigning them to a Caseworker in another unit. Brown Dep. 66–68; Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20. In summer 2007, Victor gave Brown the additional task of calling the building's

9

maintenance worker, William, to have him fix the vents and adjust the temperature. Brown Dep. 71.

On June 22, 2010, HRA reprimanded Brown for allowing Miller to leave work to conduct personal business on Agency time, in violation of HRA's policies regarding time and leave. *See* Sekendiz Decl. Ex. L (HRA's letter to Brown detailing the results of her Step II Hearing). However, this reprimand stemmed from an incident that had begun back in 2009, when the City's Special Investigations Division ("SID") interviewed Brown about the discrepancies in Miller's leave time. Brown Dep. 125; Def. 56.1 ¶¶ 107–108; Pl. 56.1 ¶¶ 107–108[3]; *see also* Switzer Decl. Ex. X (SID's memorandum to HRA personnel regarding the results of their investigation). On November 6, 2009, the City recommended that Brown "be scheduled to receive time and leave training, and be formally counseled" for disobeying the Agency's policies. Switzer Decl. Ex. X. Consequently, on June 22, 2010, Brown received the penalty of a five-day pay fine, which was then amended to be an Official Reprimand. *See* Sekendiz Decl. Ex. L.

In September 2010, Victor informed Brown that she was to take over Robert Domina's case load in Staten Island, where Brown lives, while Domina was out on extended medical leave. Brown Dep. 97. Brown conducted two home visits and then refused to do any more for Domina's remaining cases. *Id.* at 100. On January 11, 2011, Victor wrote a memorandum to Sandra Brown, Deputy Director of APS, and Holt-Knight, titled "Insubordination." Switzer Decl. Ex. Z, at D231. In the memorandum, Victor complained that Brown refused to help out with Domina's case load and attached a copy of HRA's Code of Conduct for Brown's review.

---

[3] Brown disputes Def. 56.1 ¶ 108, but only insofar as it asserts that Brown authorized Miller to leave and go to court on Agency time; Brown contends that she never authorized Miller to leave and go to court on April 15, 2009 and June 18, 2009 while on Agency time. Pl. 56.1 ¶ 108.

*Id.* In response, on January 14, 2011, Brown emailed a rebuttal memorandum, titled

"Insubordination Rebuttal," asking Victor to stop "the constant 'Harassing, Bullying, Utilizing

Abusive Behavior and Ignoring my Level of Professionalism and Skills [*sic*].'" Switzer Decl.

Ex. AA. Brown complained that she was Victor's "Scapegoat and Gofer," and blamed him for

making her his "personal 'Defense Mechanism' in relations [*sic*] to the 'Veteran Caseworkers'

and 'Staff Members' within the unit." *Id.* Brown accused Victor of having a "serious behavioral

'Psychological' problem [*sic*]." *Id.*

On February 3, 2011, Victor wrote to Holt-Knight, requesting that disciplinary action be

taken against Brown for her continued refusal to help out on Domina's cases. *See* Sekendiz

Decl. Ex. N. On February 22, 2011, Brown received her 2010 Employee Evaluation. *See*

Sekendiz Decl. Ex. O (Brown's response to Victor's evaluation in which she asserts that she was

subjected to "ongoing harassment, bullying, demeaning, degrading, abuse, discrimination-female

and retaliation [*sic*] . . . on a personal level" by Victor, and thus, did not deserve the negative

evaluation). The Non-Managerial Performance Evaluation reviewed Brown's work between

January 1, 2010 and December 31, 2010. *See* Sekendiz Decl. Ex. P (HRA's response to Brown's

claim that her evaluation was not justified). Brown was unhappy with her evaluation and

appealed the results to the Agency Review Board. *Id.* After considering the case and reviewing

the evidence, the Board denied Brown's appeal. *Id.*

**D.    Brown's EEOC History**

On November 16, 2010, Brown completed an Intake Questionnaire at the office of the

Equal Employment Opportunity Commission ("EEOC"). Sedendiz Decl. Ex. G. In the

Questionnaire, Brown alleges that she was discriminated against by her "Unit Director, Jerry

Victor." *Id.* Brown based her claim of discrimination on "salary and job assignment" grounds.

11

*Id.* In Brown's attached two-page affidavit, she complained about Victor's decision to assign her

Domina's caseload and described how she has refused to do anything on Domina's caseload save

for the two home visits she made initially. *Id.* Brown also complained that Miller is a "very

aggressive man towards females," so "someone other than a female" should be supervising him.

*Id.* Brown also described two instances in which two female co-workers reported that they saw

Miller standing around outside HRA's office building (once on August 20, 2010 and again on

October 5, 2010). *Id.*

On January 7, 2011, Brown filed a Charge of Discrimination with the EEOC. Switzer

Decl. Ex. FF; Def. 56.1 ¶ 130; Pl. 56.1 ¶ 130. On February 10, 2011, in response to her Charge

of Discrimination, the EEOC issued Brown a Notice of Right to Sue. Def. 56.1 ¶ 131; Compl.

¶ 9.

### E.     Procedural History

On April 20, 2011, Brown filed the Complaint in this case. Dkt. 1. On February 13,

2013, defendants filed a motion for summary judgment. Dkt. 36–39. On March 24, 2013,

Brown filed her opposition to the motion. Dkt. 43–45. On April 8, 2013, defendants filed a

reply. Dkt. 47. On June 5, 3013, the Court heard argument on the motion.

## II.     Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a

summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

Brown brings claims under Title VII for being subjected to a hostile work environment and unlawful retaliation, as well as parallel claims under New York State and New York City Human Rights Laws. The Court addresses each in turn.

### A.   Timeliness

As a threshold matter, the City argues that Brown's hostile work environment claim is time-barred, because each of the alleged comments and incidents that Brown points to falls outside of the statutory period.[4] Def. Br. 2–3. The parties disagree as to when the statutory period began. The City claims that the period began 300 days before January 7, 2011, when Brown filed a charge of discrimination with the EEOC, *see* Def. Br. 2; Brown contends that the

---

[4] The timeliness of Brown's retaliation claims is not disputed.

period began 300 days before November 20, 2010, when she submitted her Intake Questionnaire, *see* Pl. Br. 15.

### 1.    Standard for EEOC Claims

Under Title VII, a plaintiff may assert only claims involving acts alleged to have occurred within 300 days of filing a discrimination complaint with a state or local agency. *See* 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). A litigant has up to "300 days *after* the unlawful practice happened to file a charge with the EEOC;" if a claim "is not filed within these time limits," it is time-barred. *Nat'l R.R.*, 536 U.S. at 109–10 (emphasis in original).

On November 16, 2010, Brown completed an Intake Questionnaire at the EEOC. Sekendiz Decl. Ex. G. If that is the operative date, any claims pertaining to discrete discriminatory acts that occurred before January 20, 2010 would be time-barred. The City, however, argues that the Intake Questionnaire does not qualify as a permissible charge that tolls the 300-day filing period. Instead, the City argues that Brown's charge of discrimination, which she filed with the EEOC on January 7, 2011, is the date that signifies her official EEOC charge, and consequently, the date that starts the 300-day statutory period. Switzer Decl. Ex. FF. If January 7, 2011 is the operative date, then any claims pertaining to discrete discriminatory acts which occurred before March 13, 2010 would be time-barred.

### 2.    What Constitutes a "Charge"?

Title VII provides that the 300-day statutory look-back period is measured from the filing of a "charge," *see* 42 U.S.C. § 2000e-5, but it does not define the term "charge." Title VII's implementing regulations provide: "A charge shall be in writing and signed and shall be verified." 29 C.F.R. § 1601.9.

14

In *Federal Express Corp. v. Holowecki*, the Supreme Court was faced with the similar question of whether an intake questionnaire filed with the EEOC could be deemed a "charge" under the Age Discrimination in Employment Act of 1967 ("ADEA"). 552 U.S. 389, 398–99 (2008). Applying *Skidmore* deference,[5] the Court approved the EEOC's interpretive position, holding: "In addition to the information required by the regulations, . . . if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at 402. That is, "the filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes." *Id.*

In so holding, the Court cautioned that, despite similarities between the EEOC enforcement mechanisms for ADEA claims and other statutes enforced by the EEOC—such as Title VII—"employees and their counsel must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination . . . even if the EEOC forms and the same definition of charge apply in more than one type of discrimination case." *Id.* at 393. Nevertheless, courts in this Circuit have, since *Holowecki*, examined the implementing regulations of Title VII and found that the standard announced in *Holowecki* for determining what is a "charge" is also reasonably applied to Title VII. *See, e.g., Price v. City of N.Y.*, 797 F. Supp. 2d 219, 225 (E.D.N.Y. 2011) (analyzing the relevant regulations and finding the *Holowecki* standard applicable because the regulations that apply to both Title VII and the Americans with Disabilities Act ("ADA") bear substantial similarity to the regulation discussed

---

[5] *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (administrative agency's interpretive rules deserve deference according to their persuasive force); *see generally United States v. Mead Corp.*, 533 U.S. 218 (2001) (affirming continued recognition of *Skidmore* deference).

in *Holowecki*); *accord Lugo-Young v. Courier Network, Inc.*, No. 10–CV–3197, 2012 WL
847381, at *6 (E.D.N.Y. Mar. 13, 2012); *Broich v. Inc. Vill. of Southampton*, No. CV–080553
(SJF)(ARL), 2011 WL 284484, at *6–7 (E.D.N.Y. Jan. 25, 2011), *vacated in part on other
grounds by* 462 F. App'x 39 (2d Cir. 2012); *Morrow v. Metro. Transit Auth.*, No. 08 Civ. 6123
(DLC), 2009 WL 1286208, *5 n.6 (S.D.N.Y. May 8, 2009); *Simpson v. City of N.Y. Dep't of
Hous. Pres. & Dev.*, No. 08 Civ. 0185 (SHS)(KNF), 2009 WL 996388, at *5–6, (S.D.N.Y. Apr.
13, 2009).

Significantly, since *Holowecki* was decided, the EEOC has modified its form Intake
Questionnaire—as the Supreme Court suggested it might, *see Holowecki*, 552 U.S. at 407—to
facilitate the determination whether such a questionnaire, in any particular case, constitutes a
charge. Specifically, "the EEOC has changed the [Intake Questionnaire] to require a claimant to
clearly express his or her intent by checking one of two boxes, thereby 'forc[ing] claimants to
decide whether their questionnaire is a request for the agency to take remedial action, such that
courts can objectively determine whether each questionnaire is a charge of discrimination or
merely a request for further information.'" *Lugo-Young*, 2012 WL 847381, at *6 (quoting
*Hawthorne v. Vatterott Educ. Ctrs., Inc.*, No. 09–CV–442–TCK–PJC, 2010 WL 3258560, at *4
(N.D. Okla. 2010)).

Brown's Intake Questionnaire reflects the changes the EEOC made after *Holowecki*.
Brown checked Box 2 on the Questionnare, which clearly indicates that she wished to file a
charge. Box 2 reads:

> I wish to file a charge of discrimination, and I authorize the EEOC to look into the
> discrimination I described above. I understand that the EEOC must give the
> employer, union, or employment agency that I accuse of discrimination
> information about the charge, including my name. I also understand that the
> EEOC can only accept charges of job discrimination based on race, color,

16

religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

Sekendiz Decl. Ex. G.

Furthermore, Brown's Intake Questionnaire "provided the EEOC with the information required by the relevant regulations," *Price*, 797 F. Supp. 2d at 266 (quoting *Holowecki*, 552 U.S. at 402), in that the charge is signed and in writing and verified, *see* 29 C.F.R. § 1601.9. And in completing the Intake Questionnaire, Brown clearly intended for the EEOC to "take remedial action." *Holowecki*, 552 U.S. at 402. Not only did Brown check Box 2 on the Intake Questionnaire form, *see* Sekendiz Decl. G, she also included a two-page affidavit detailing the City's, and Victor's, alleged discriminatory acts. Like the six pages of documents the plaintiff in *Holowecki* attached to her questionnaire, Brown's additional documents confirm her intention for the EEOC to take action on her behalf. Brown's submissions, taken as a whole and examined from the point of view of an objective observer, are a clear attempt to activate the agency review process.

In light of these facts, the Court finds that Brown's Intake Questionnaire qualifies as a charge with the EEOC for timeliness purposes. Consequently, the correct date from which to measure the retrospective 300-day period provided for by the statute is November 16, 2010. Thus, any discrete discriminatory acts that occurred before January 20, 2010 are time-barred.

### 3.    Continuing Violation Doctrine

This, however, does not end the timeliness inquiry, because many of the alleged acts constituting Brown's hostile work environment occurred before January 20, 2010. However, under the "continuing violation" exception to Title VII, "[a] claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for purposes of

determining liability.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Nat'l R.R.*, 536 U.S. at 117). Accordingly, Brown needed "only [to] file a charge within . . . 300 days of *any* act that [was] part of the hostile work environment." *Nat'l R.R.*, 536 U.S. at 118 (emphasis added). This is because a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)). "[F]or the purposes of the statute," it does not matter that "some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* Thus, "an employer may be liable for all acts that are part of [a] single [hostile work environment] claim." *Id.* at 118.

Here, some of Miller's most egregious conduct post-dated the January 20, 2010 cut-off date. In March 2010, Brown's female co-workers informed her that Miller had been propositioning them for sex. *See* Brown Dep. 132; Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50. On March 5, 2010, which was the last date that Brown and Miller were in the office at the same time, Miller went off the rails. He reportedly grabbed three female co-workers in bear hugs and would not let them go, *see* Switzer Decl. Ex. W, accosted one female co-worker in the bathroom, *see* Switzer Decl. Ex. CC, and grabbed another female co-worker tightly around the waist and grabbed her chest when she tried to push him away, *see* Sekendiz Decl. Ex. Z. Finally, in Miller's *coup de grace*, he entered a female co-worker's cubicle, hit her on the shoulder, and stood fully exposed, masturbating, while his co-workers looked on. *Id.* Although Brown was a direct witness to only some of these events, the events were an integral part of—indeed, they were the culmination of—the sustained pattern of behavior that constituted the alleged hostile work environment. Thus, the continuing violation doctrine applies here. Accordingly, Miller's conduct before the January 20, 2010 cut-off date may also be considered.

## B.    Title VII Hostile Work Environment Claim

Brown alleges that Miller's conduct was directed at her on the basis of her gender, and

that his actions, taken together, created a hostile work environment.

### 1.    Legal Standard

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State*

*Univ.*, 133 S. Ct. 2434, 2441 (2013).  Under Title VII, a hostile work environment claim

> requires a showing [1] that the harassment was "sufficiently severe or pervasive to
> alter the conditions of the victim's employment and create an abusive working
> environment," and [2] that a specific basis exists for imputing the objectionable
> conduct to the employer. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.
> 1997) (internal citations and quotation marks omitted).  The plaintiff must show
> that the workplace was so severely permeated with discriminatory intimidation,
> ridicule, and insult that the terms and conditions of her employment were thereby
> altered.  *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)
> (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Brennan v.
> Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).  This test has
> objective and subjective elements: the misconduct shown must be "severe or
> pervasive enough to create an objectively hostile or abusive work environment,"
> and the victim must also subjectively perceive that environment to be abusive.
> *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  As a general rule, incidents
> must be more than "episodic; they must be sufficiently continuous and concerted
> in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation and internal
> quotation marks omitted).  Isolated acts, unless very serious, do not meet the
> threshold of severity or pervasiveness.  *Brennan*, 192 F.3d at 318; *see also
> Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "we have
> made it clear that conduct must be extreme to amount to a change in the terms and
> conditions of employment").

*Alfano v. Costello*, 294 F.3d 365, 373–74 (2d Cir. 2002).  Title VII "does not set forth 'a general

civility code for the American workplace,'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)), and

thus "does not reach genuine but innocuous differences in the ways men and women routinely

interact with members of the same sex and of the opposite sex." *Oncale*, 523 U.S. at 81.

19

In analyzing a hostile work environment claim, the Court is "required to look to the record as a whole and assess the totality of the circumstances, considering a variety of factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (citation omitted). Taking into account the "continuing violation" exception to Title VII claims, and analyzing the facts in the light most favorable to Brown, Miller's conduct suffices to create a genuine issue of fact whether Brown suffered a hostile work environment.

### 2. A Reasonable Jury Could Find an Objectively Hostile Work Environment

Brown supervised Miller for approximately three years, between May 2007 and March 2010. In that time period, Miller repeatedly touched and rubbed Brown's hands despite her requests that he stop, Brown Dep. 113, 115, 119, exhibited a general aggressiveness towards women, *id.* at 120–21, and stared at female co-workers in her presence, *id.* at 115. Miller informed Brown that "he's not taking orders from females." *Id.* at 111; Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30. Brown also observed Miller with "his hand on his crotch" while he was sitting at his desk, after which he would "use the restroom by the kitchen [to] wash up." Brown Dep. 114; Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.

Victor, Brown's direct supervisor, assigned Miller to be under Brown's supervision, Brown Dep. 68; Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22, and Brown testified that Victor ignored her many complaints about Miller's workplace behavior, Brown Dep. 120; Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.[6]

---

[6] Victor's apparent tolerance of Brown's conduct can perhaps be explained by his view, allegedly expressed to Brown, that "a man and God are equal and a woman is below." Brown Dep. 98–99.

Furthermore, while under Brown's supervision and known to Brown, Miller acted inappropriately towards other female employees.[7] Miller would give them "bear hugs," Brown Dep. 174–75; Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39, would masturbate in the office bathroom, Brown Dep. 115, 187–88; Def. 53.1 ¶ 38; Pl. 56.1 ¶ 38, and would ask female employees for sex, Brown Dep. 132; Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50. On March 5, 2010, Miller "sexually exposed himself and grabbed some of the female workers on [Brown's] floor." Switzer Decl. Ex. W. Miller also assaulted Cherry-Ann Samuel when she was in the bathroom, Sedendiz Decl. Ex. CC (Samuel's memo describing the encounter), and masturbated in front of Valdine Depeiza when she was working in her cubicle, Sekendiz Decl. Ex. Z (Depeiza's memo describing the incident), an incident witnessed by numerous other employees, *id.*

Taken together, these actions suffice for a reasonable jury to find that Brown was subjected to a hostile work environment.

The City argues, nevertheless, that this conduct was not gender-based. The City is correct that, in order to prevail on a Title VII claim, Brown must demonstrate that the City and HRA were motivated by a discriminatory animus. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, [including] subjection to a hostile work environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."); *accord Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("It is . . . important in hostile work environment cases to exclude from consideration personnel

---

[7] In analyzing a hostile work environment claim, "[e]vidence of the harassment of women other than [the Plaintiff], if part of a pervasive or continuing pattern of conduct," is "relevant to show the existence of a hostile environment at [the plaintiff's workplace]," and can be "found probative of the company's notice of that environment within the [statutory] period." *Perry*, 115 F.3d at 151.

decisions that lack a linkage or correlation to the claimed ground of discrimination."). However, Brown has amply done so here.

Miller's statement to Brown that "he's not taking orders from females," Brown Dep. 111, is clearly gender-based.[8] On the summary judgment record, Miller's actions, specifically the bear hugs, hand-touching, and staring, were all directed either solely or overwhelmingly at female employees. There is no evidence in the record that Brown behaved similarly towards male employees. As for masturbating in the office bathroom, it is unclear whether Miller meant only for the City's female employees to hear him, but they were the only ones who complained about the noises to Brown. Brown Dep. 115, 187–88; Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38. Finally, the summary judgment record reflects that Miller propositioned only the City's female employees for sex. Brown Dep. 132; Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50. Although Miller's actions were not in each case directed at Brown, they were in some instances, and they were aimed specifically at the City's *female* employees, who made multiple complaints to Brown. A reasonable jury could find that, taken as a whole, Miller's actions contributed to creating a gender-based hostile work environment.

### 3.    Miller's Conduct May Be Imputed to Defendants

To satisfy a hostile work environment claim, Brown must also show that "a specific basis exists for imputing the objectionable conduct to the employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citations omitted). The standards for assessing vicarious liability differ depending on the status of the alleged harasser. When a "supervisor"[9] does the harassing,

---

[8] As is Victor's statement to Brown that "a man and God are equal and a woman is below." Brown Dep. 98.

[9] "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 133 S. Ct. at 2439. That is, a supervisor has the ability to "to effect a significant change in

the conduct is attributable to the employer if (1) the supervisor takes a tangible employment action, or (2) the employer is unable to establish an affirmative defense by showing that it exercised reasonable care to prevent and correct any harassing behavior and that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided. *See Vance*, 133 S. Ct. at 2442 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 525 U.S. 775 (1998)). By contrast, in situations where a "co-worker harasses the plaintiff," an employer can be "directly liable for [that] employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." *Id.* at 2441. Here, Miller was a co-worker, not Brown's "supervisor."[10]

The Second Circuit has held that "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (quoting *Perry*, 115 F.3d at 149); *accord Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). At argument, defense counsel asserted that Miller's conduct towards Brown cannot be imputed to the City, because it has an anti-discrimination policy that supplies a reasonable avenue for complaint. But even taking that as true, liability may be imputed to the City and HRA, based on Victor's knowledge of Miller's conduct, Brown's complaints to Victor about that conduct, and

---

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (citation omitted).

[10] Indeed, Brown was *Miller's* supervisor—at least in the colloquial sense. The evidence adduced at summary judgment does not demonstrate that Brown was Miller's supervisor in the legal sense addressed in *Vance*. But that is beside the point here, where the offensive behavior was committed by an inferior, not a superior; and where the relevant supervisor in creating potential liability is Victor, Brown's supervisor who, allegedly, was unresponsive in the face of Brown's complaints about Miller.

Victor's failure to act: "Despite offering a reasonable avenue of complaint to plaintiff, employer

defendants can still be held liable if plaintiff can show that they knew, or in the exercise of

reasonable care should have known, about the harassment yet failed to take appropriate remedial

action." *Duch*, 588 F.3d at 763. "This standard requires a plaintiff to show that (1) *someone* had

actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be

imputed to the employer, and (3) the employer's response, in light of that knowledge, was

unreasonable." *Id.* The Second Circuit has further explained that, with respect to imputing the

knowledge of employees to an employer,

> [a]n official's actual or constructive knowledge of harassment will be imputed to
> the employer when principles of agency law so dictate. That will be the case
> when a) the official is at a sufficiently high level in the company's management
> hierarchy to qualify as a proxy for the company, or b) the official is charged with
> a duty to act on the knowledge and stop the harassment, or c) the official is
> charged with a duty to inform the company of the harassment.

*Id.* (quoting *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997)).

Defendants themselves have emphasized in this case that the City has in place anti-

discrimination policies that place an affirmative duty on supervisors to promptly report any

suspected violation of those policies. *See* Def. Br. 14 (citing Switzer Decl. Ex. BB, CC, DD,

EE). But if those policies applied, as the defendants argue, to impose duties on Brown as

Miller's supervisor,[11] they surely imposed the same obligations on Victor, the supervisor of both

Brown (directly) and Miller (indirectly). Brown testified that on several occasions she told

Victor about Miller's extremely inappropriate workplace behavior. Brown Dep. 120; Def. 56.1

¶ 55; Pl. 56.1 ¶ 55. Brown testified that "[e]very time [Miller] did something on the floor [that

---

[11] The City argues that Brown herself was in violation of these policies for not reporting Miller's
behavior. *See* Def. Br. 14. But, as noted, Brown repeatedly told her supervisor, Victor, about
Miller's conduct.

was] sexual or the loud noises was [*sic*] just unbearable, [she] would go to Jerry [Victor] and tell Jerry and Jerry would just ignore [her]." Brown Dep. 120. Brown also testified that on one occasion when she tried to complain to Victor, he "turned his office chair from [her], just turned it around as if [she] was [*sic*] talking to the wall." *Id.* This testimony, and the widespread knowledge of Miller's improprieties and predations, as related in the assembled evidence, supplies a sufficient basis upon which a reasonable jury could find that Victor well knew of Miller's wrongful conduct and had a duty to report it to his employer. This included Miller's conduct after January 20, 2010—specifically, on March 5, 2010, assaulting co-workers and masturbating in their presence. A reasonable jury could therefore find that the defendants' failure to remove Miller from the workplace, in light of that knowledge, was unreasonable.[12] Thus, there is a sufficient basis upon which a reasonable jury could impute liability to the defendants, because they "knew of the harassment but did nothing about it." *Rojas*, 660 F.3d at 107 (quoting *Perry*, 115 F.3d at 149).

Accordingly, defendants' motion for summary judgment on Brown's hostile work environment claim is denied.

---

[12] The City counters that "as an employer HRA must walk a tightrope between the various discrimination laws, accommodating Miller's disability and simultaneously protecting other workers," and that it appropriately walked this tightrope when, after Miller's December 29, 2009 outburst, supervisory personnel promptly took remedial action by initiating a "Section 72." Def. Br. 15 (citing Switzer Decl. Ex. O (Deborah Holt-Knight's request to initiate Section 72 proceeding)). At trial, the City may be able to defend its apparent inaction on the ground that it was seeking to balance its competing obligations to Brown and her co-workers on the one hand, and Miller, on the other hand, whose behavior reflected a disability that the City sought to accommodate. But that is a decision for the jury. Because a reasonable jury could find for Brown on this point, the Court cannot grant the City's motion for summary judgment.

### C.    Title VII Retaliation Claim

Brown also claims that the City retaliated against her for her December 31, 2009 memorandum describing Miller's workplace behavior, by giving her (1) an official reprimand and (2) extra assignments that "technically demoted" her." Pl. Br. 21.

### 1.    Legal Standard

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  The statute thus "prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).  Title VII's anti-retaliation provision specifically "seeks to further [the Act's] goal of a workplace free from discrimination on the basis of . . . gender." *Id.*  The provision's primary objective is to "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington N.*, 548 U.S. at 63.  The Supreme Court has recently clarified that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in [42 U.S.C.] § 2000e–2(m) [for status-based employment discrimination claims].  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

In adjudicating retaliation claims, courts follow the "familiar burden-shifting framework" of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). To prove a prima facie case of retaliation, a plaintiff must establish: (1) that she participated in a protected activity; (2) that participation in the protected activity was known to the employer; (3) that the employer thereafter subjected her to a materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The burden of proof at the prima facie stage has been characterized as "de minimis." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

If this initial burden is met, "a presumption of retaliation arises," and the burden shifts to "the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If and when the employer meets that burden of production, "'the *McDonnell Douglas* framework . . . disappear[s] and the sole remaining issue . . . [is] discrimination *vel non.*'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)). The plaintiff must then prove the ultimate issues without any "benefit of . . . intermediate burdens and presumptions." *Id.*; *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The plaintiff may satisfy this burden by showing "pretext," *i.e.*, that the employer's proffered reason was false, *see, e.g.*, *Reeves*, 530 U.S. at 143, 147. However, "if the record conclusively reveal[s] [a] nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact [as to pretext] and there [i]s abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," then the employer is entitled to judgment as a matter of law. *Reeves*, 530 U.S. at 148; *see also Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125–26 (2d

Cir. 2008) (concluding that "overwhelming evidence" of legitimate reason for dismissal warranted judgment as a matter of law).

### 2.    Brown Fails to Make Out a Prima Facie Case for Retaliation

Here, Brown bases her retaliation claim on two grounds: (1) the assignment of extra nonsupervisory duties, and (2) an official reprimand issued by the City. Pl. Br. 21–22. The City does not dispute that it knew that Brown wrote a memo, Switzer Decl. Ex. K ("the Memo"), to Holt-Knight on December 31, 2009. Thus, to establish a *prima facie* case of retaliation, Brown must adduce sufficient evidence on which a reasonable jury could find that writing the Memo was a protected activity, that she suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action.

#### a.    No Protected Activity

First, Brown argues that her December 29, 2009 Memo to Holt-Knight describing Miller's workplace behavior was a protected activity. Pl. Br. 21. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000); *see* 42 U.S.C. § 2000e-3. Brown's Memo addresses Miller's "abnormal behavior." Sekendiz Decl. Ex. F. In particular, the Memo describes the "seven Georges," details how Miller "wears music headphones . . . talk/rap[s] 'loud lyrics' such as 'gun shots' and 'profane language,'" and "dances in the aisle while workers are in their cubicle working." *Id.* Brown also informed Holt-Knight that she "can only receive [Miller's] cases with out [*sic*] reviewing them with him" because Miller "demonstrated that his assign cases [*sic*] on what he worked on are approved by the unit Director who is a male." *Id.*

Notably, however, although detailing behavior by Miller that is aptly described as troubled and provocative, Brown's Memo makes no explicit mention of any alleged sexual

harassment, either in regards to herself or in regards to her co-workers. The closest the Memo

comes to alleging sexual harassment is its statement that Miller "becomes agitated with

supervision and especially a female," and has an "aggressive behavior with females." *Id.*

However, Brown's Memo does not mention Miller staring at, touching, or hugging her, or any

other City female employee. Nor does the Memo say anything about Miller's masturbating at

work, either at his desk or in the bathroom. Those facts appear in Brown's later EEO Complaint,

which explicitly outlined her allegations of hostile work environment, and were abundantly

documented in discovery in this case. Brown's Memo merely chronicles Miller's bizarre and

discordant behavior in the workplace, while making at best glancing references to any gender-

focus on that behavior. Accordingly, Brown's Memo does not constitute "protected activity"

under Title VII because a reasonable jury could not find that she wrote it to "protest or oppose

*statutorily prohibited discrimination.*" *Cruz*, 202 F.3d at 566 (emphasis added).

### b.    No Adverse Employment Action

Even assuming that the Memo does constitute a protected activity, Brown cannot show

that she suffered an adverse employment action. An adverse employment action is a "materially

adverse change in the terms and conditions of employment." *Sanders v. N.Y. City Human Res.

Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted). "To be materially adverse, a change

in working conditions must be more disruptive than a mere inconvenience or an alteration of job

responsibilities." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders*,

361 F.3d at 755). "Examples of such a change include termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular

situation." *Id.* "Petty slights, minor annoyances, and simple lack of good manners will not" give

29

rise to actionable retaliation claims. *Burlington Northern*, 548 U.S. at 68; *see e.g.*, *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011); *Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 286 (S.D.N.Y. 2012).

Brown's assertion is that she was assigned extra clerical duties and caseworker responsibilities, and thus was "technically demoted." But, on the undisputed facts before the Court, this does not constitute a "materially adverse change." *Sanders*, 361 F.3d at 755. In 2005 or 2006, two years before Miller arrived and four years before Brown filed her complaint, she had been assigned similar clerical work. Brown Dep. 64–65; Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18. Those duties included "answer[ing] the phone, do[ing] the fax, clerical work, [and] field work at times. *Id.* Additionally, in 2006 or 2007, Brown was assigned an "additional task" of "count[ing] the heads in the unit." Brown Dep. 66; Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19. In fact, as a Supervisor I in APS, Brown's day-to-day responsibilities included "answering the phones." Brown Dep. 51; Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9. Although Brown may have been responsible after filing her complaint for answering more calls, her duties did not significantly change. Furthermore, Brown's supervisory responsibilities typically included "going out in the field . . . on pending cases to open up homes for people," *id.*, and that is what Victor assigned her to do, Brown Dep. 100. This assignment thus also did not constitute a significant change from Brown's ordinary responsibilities. The assignment of minor, additional duties—especially where similar tasks have been a part of Brown's duties in the past—may be "minor annoyances." *Burlington Northern*, 548 U.S. at 68. But they are not "materially adverse change[s] in the terms and conditions of [Brown's] employment." *Sanders*, 361 F.3d at 755.

Brown also argues that she suffered a materially adverse action when she received an official reprimand from HRA. An official reprimand may constitute a materially adverse action

in some situations. *See Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary

order) (collecting cases) ("Reprimands . . . may, in some circumstances, constitute adverse

employment action."). A reprimand constitutes an adverse employment action when it

"trigger[s] negative consequences to the conditions of employment." *Taylor v. N.Y.C. Dep't of

Educ.*, No. 11 Civ. 3582, 2012 WL 5989874, at *7 (E.D.N.Y. Nov. 30, 2012) (citing *Siddiqi v.

N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008)).  However, Brown

does not claim that she suffered any negative consequences after the City released the reprimand,

and there is no record evidence of such consequences.  Absent any such consequences, Brown's

reprimand, in and of itself, does not constitute a materially adverse employment action.

### c.  No Causation

In any event, even assuming that the Memo was protected activity and either the extra

duties or the official reprimand qualify as an adverse employment action, Brown cannot show a

causal connection between her writing the Memo and (1) receiving the extra assignments, or (2)

getting an official reprimand.

"Causation of an adverse employment action traceable to a protected activity may be

established 'either: (1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or through other circumstantial evidence such as disparate treatment of

fellow employees who engaged in similar conduct; or (2) directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant.'" *Moccio v. Cornell Univ.*, 889

F. Supp. 2d 539, 587 (S.D.N.Y. 2012) (quoting *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir.

2010)), *aff'd*, 2013 WL 1943276 (2d Cir. May 13, 2013).  "Title VII retaliation claims must be

proved according to the traditional principles of but-for retaliation," which "requires proof that

the unlawful retaliation would not have occurred in the absence of the alleged wrongful act or

31

actions of the employer." *Nassar*, 133 S. Ct. at 2533.  Here, Brown does not point to any direct evidence of retaliatory animus, nor any evidence of disparate treatment of fellow employees.

"Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor*, 609 F.3d at 552.  As to the official reprimand, Brown cannot establish an inference of causation based on temporal proximity. Brown wrote and submitted her Memo on December 29, 2009; six months later, on June 22, 2010, Brown received an Official Reprimand.  *See* Sekendiz Decl. Ex. L.  Although there is no bright-line rule for when an alleged retaliatory action is too attenuated from protected activity to be considered causally linked, a plaintiff who relies solely on "mere temporal proximity between protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case" must plead that the events were "very close" in time.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted).  "District courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007); *see also Garrett v. Garden City Hotel., Inc.*, No. 05–CV–0962 (JFB)(AKT), 2007 WL 1174891, at *20–21 (E.D.N.Y. Apr. 19, 2007) (two and one half months too remote to establish causation); *Ruhling v. Tribune Co.*, No. CV 04–2430 (ARL), 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) ("a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." (citation omitted)); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit an inference of causation."); *Nicastro v.*

32

*Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) (three months too remote). Thus, the six-month period between Brown's Memo and the official reprimand does not establish a temporal nexus.

By contrast, Victor assigned Brown additional duties in the middle of January 2010, less than a month after Brown's Memo. *See* Sekendiz Decl. Ex. I. Therefore, this alleged adverse employment action is within the time frame that may permit an inference of causation. Nevertheless, Brown cannot establish an inference that Victor gave her clerical work and caseworker responsibilities *because* she wrote the Memo. As noted, for years before she wrote the Memo, Brown had been responsible for exactly this type of work. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *accord Mayling Tu v. Oppenheimer Funds, Inc.*, No. 10 Civ. 4971 (PKC), 2012 WL 516837, at \*10 (S.D.N.Y. Feb. 16, 2012) (collecting cases where adverse job actions prior to protected activity negate inference of retaliation).[13]

Accordingly, Brown fails to make out a prima facie case for her retaliation claim. Defendants' motion for summary judgment on this claim is granted.

---

[13] Similarly, Brown cannot show that she was given an official reprimand by the City in response to the Memo because the reprimand stemmed from an incident that began in the fall of 2009—months before Brown wrote her Memo. *See Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, No. 10 Civ. 6445 (PAE), 2012 WL 6625271, at \*19 (S.D.N.Y. 2012) (finding that plaintiff's ultimate termination was not retaliation because the disciplinary process that resulted in the termination was already under way before plaintiff filed her complaint).

**D.     State and City Human Rights Claims**

In her complaint, Brown asserts hostile work environment and retaliation claims under

the parallel provisions of the NYSHRL and NYCHRL.[14]  *See* Compl. ¶¶ 78 (hostile work

environment under N.Y. Exec. L. § 296(1)(a)), 82 (retaliation under N.Y. Exec. L. § 296(7)), 89

(hostile work environment under N.Y.C. Admin Code § 107(1)(a)), 92 (retaliation under N.Y.C.

Admin. Code § 8-107(7)).[15]

**1.     Hostile Work Environment**

Under the NYSHRL, Brown's hostile work environment claim is analyzed under the

same standard as her Title VII claims.  *See Demoret v. Zegarelli*, 451 F.3d 140, 152 (2d Cir.

2006) (citing *Forrest v. Jewish Guild for Blind*, 3 N.Y.3d 295, 305, 310–11 (2004)); *accord*

*Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).  Under the

NYCHRL, the standard for liability is more permissive: the offensive conduct need not be

"severe or pervasive" but need only amount to "unwanted gender-based conduct."  *Anderson v.*

*N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st Dep't 2009); *accord Anderson v. Davis, Polk &*

*Wardwell, LLP*, No. 10 Civ. 9338 (NRB), 2013 WL 1809443, at *2 (S.D.N.Y. Apr. 29, 2013).

Therefore, because a reasonably jury could find a hostile work environment under federal law, it

could also find such an environment under state and city law.

"However, courts have applied a stricter standard under the state and local human rights

laws with regard to the imputation of liability to an employer."  *Int'l Healthcare Exch., Inc. v.*

---

[14] The Court exercises supplemental jurisdiction over these claims, because one federal claim
remains in the case and it is closely related to the state and city law claims.  *See* 28 U.S.C. §
1367(a); *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997).

[15] Brown actually cites to a different provision in her Complaint—N.Y.C. Admin. Code § 8-
107(1)(e)—but then quotes language not found in that provision.  She appears to be alleging a
retaliation claim, *see* Compl. ¶ 93, and in her brief refers to § 8-107(7), the retaliation provision.
*See* Pl. Br. 23.

*Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (collecting cases);
*accord Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 410 (W.D.N.Y.
2010), *aff'd* 660 F.3d 98, 107 (2d Cir. 2010); *see also Torres v. Pisano*, 116 F.3d 625, 629 n.1
(2d Cir. 1997) ("It has also been suggested that in terms of imputing liability to the employer, the
New York State Human Rights Law imposes a stricter standard than Title VII. But we need not
consider those issues here." (citation and alterations omitted)). Liability for an employee's
discriminatory acts may not be imputed to an employer, under state law, "unless the employer
became a party to it by encouraging, condoning, or approving it." *Forrest*, 3 N.Y.3 at 311
(quoting *Matter of State Div. of Human Rights v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687
(1985)). The NYCHRL imposes liability on the employer in three instances, including "where
the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced
in it or failed to take 'immediate and appropriate corrective action.'" *Zakrzewska v. New School*,
14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)). "[A]n employer shall
be deemed to have knowledge of an employee's or agent's discriminatory conduct where that
conduct was known by another employee or agent who exercised managerial or superivsory [*sic*]
responsibility." N.Y.C. Admin. Code § 8-107(13)(b)(2). Even under these "stricter" standards, a
reasonable jury could impute liability to defendants: As discussed in Part III(B)(3), *supra*,
Brown testified that she repeatedly told Victor about Miller's conduct, *see* Brown Dep. 120,
Victor had a duty to report these allegations, *see* Switzer Decl. Ex. BB–EE, and defendants did
not remove Miller from the workplace or take other appropriate preventive action until Miller's
conduct escalated to the point where he stripped down in the workplace and masturbated in front
of his colleagues. Defendants' motion for summary judgment on Brown's NYSHRL and
NYCHRL hostile work environment claims is, therefore, denied.

## 2.   Retaliation

Brown's retaliation claim under the NYSHRL is "analytically identical to [her] claims brought under Title VII." *Rojas*, 660 F.3d at 107 n.10 (citation omitted); *accord Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010).  Thus, summary judgment is granted for defendants on this claim, for the reasons stated in Part III(C), *supra*.

However, Brown's NYCHRL retaliation claim is analyzed under a somewhat broader standard. *See Fincher*, 604 F.3d at 723; *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims."); *see also Albunio v. City of N.Y.*, 16 N.Y.3d 472, 477–78 (2011) ("[W]e must construe Administrative Code § 8-107(7), like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.").  As the Second Circuit has explained: "Under the CHRL, retaliation 'in any manner' is prohibited, and '[t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." *Fincher*, 604 F.3d at 723 (quoting N.Y.C. Admin. Code § 8-107(7)).  Although the "functional difference, if any, between the CHRL standard and that used for federal and state retaliation claims has never been fully articulated," *id.*, the First Department has rejected the materiality requirement, such that: "The proper inquiry under the CHRL is whether a jury could 'reasonably conclude from the evidence that the complained-of conduct by the employer was, in the words of the CHRL, reasonably likely to deter a person from engaging in protected activity,' without taking account of whether the employer's conduct was sufficiently deterrent so as to be 'material.'" *Id.* (alterations omitted) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 71 (1st Dep't 2009).

36

Notwithstanding the absence of the materiality requirement under the NYCHRL, however, Brown still cannot make out a claim of retaliation. "The New York Court of Appeals has held that 'opposing any practice' can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong.'" *Mihalik*, 715 F.3d at 112 (quoting *Albunio*, 16 N.Y.3d at 479) (alterations omitted). But, as discussed in Part III(C)(2)(a), *supra*, a reasonably jury could not find that Brown "opposed any practice," because the Memo that allegedly triggered the retaliation described Miller's bizarre workplace behavior—it did not discuss discriminatory conduct. And even if Brown's Memo had been written in opposition to a discriminatory practice, the Memo was not written "before the retaliatory conduct occurred." *Mihalik*, 715 F.3d at 112. As discussed in Part III(C)(2)(c), *supra*, Brown had been assigned the same sort of clerical tasks throughout her tenure at HRA, and the process that led to her reprimand had been initiated well before she wrote the Memo.

Accordingly, defendants' motion for summary judgment is also granted as to Brown's NYCHRL retaliation claim. *See Mihalik*, 715 F.3d at 112 ("[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination."); *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 n.1 (2d Cir. 2011) (summary order) (despite broader standard governing NYCHRL claims, retaliation claim fails as a matter of law where plaintiff can produce no admissible evidence of a causal connection between her protected activity and any adverse action); *Moccio*, 889 F. Supp. 2d at 592 (despite broader standard, no liability under NYCHRL where no protected activity that employer was aware of and no causal connection); *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009).

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied as to Brown's hostile work environment claims, and granted as to Brown's retaliation claims. The Clerk of Court is directed to terminate the motion pending at docket number 36.

A pretrial conference will be held on September 13, 2013, at 9:30 a.m. At that conference, the Court expects to set this case down for trial, and to set dates for the submission of the parties' joint pretrial order. The parties should be prepared to give a joint estimate as to the length of trial. Prior to that conference, counsel for each side, with settlement authority and joined, if counsel believes it useful, by a party or party representatives, are directed to meet in person for at least one hour to discuss settlement.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 18, 2013
New York, New York